IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JANET LYNN IZWORSKI, | ) | CASE NO.  1:22-CV-00793-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| vs. | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Janet Izworski ("Plaintiff" or "Izworski"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.      PROCEDURAL HISTORY

In January 2020, Izworski filed an application for POD and DIB, alleging a disability onset date of August 15, 2019, and claiming she was disabled due to anxiety, depression, high blood pressure, high cholesterol, back issues, hypothyroidism, obesity, sleep apnea, heart attack, and asthma. (Transcript ("Tr.") at 15, 74.)  The application was denied initially and upon reconsideration, and Izworski requested a hearing before an administrative law judge ("ALJ").  (Tr. 15.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On March 8, 2021, an ALJ held a hearing, during which Izworski, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On March 17, 2021, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 15-33.) The ALJ' s decision became final on March 30, 2022, when the Appeals Council declined further review. (*Id.* at 1-6.)

On May 14, 2022, Izworski filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 7-9.) Izworski asserts the following assignments of error:

(1)     The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.[2]

(2)     The ALJ erred when he failed to adopt the limitations set forth by the reviewing, treating, and examining sources and incorporate the stated limitations into his RFC.

(3)     The ALJ committed harmful error at Step Four of the Sequential Evaluation when he failed to find that the effect of the combination of Izworski's symptoms precluded her from the ability to perform her past relevant work at the light level of exertion on a full-time and sustained basis.

(4)     The ALJ erred in his credibility finding when he failed to include the limitations stated by Izworski and her daughter in his RFC.

(Doc. No. 7.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Izworski was born in August 1960 and was 60 years-old at the time of her administrative hearing (Tr. 15, 74), making her a "person of advanced age" under Social Security regulations. *See* 20 C.F.R. §

---

[2] The Commissioner states in her brief that on September 21, 2022, Plaintiff's counsel "indicated that she would withdraw her Constitutional Appointments Clause challenge . . . and will not further advance this argument in her reply brief." (Doc. No. 8 at 10 n.3.) The Court finds no record of this withdrawal on the docket. However, as Plaintiff does not dispute this statement, and indeed does not further advance this argument in her reply brief, the Court will consider this issue withdrawn.

404.1563(e). She has past relevant work as a postal counter clerk, hospital receptionist, and corrections officer. (Tr. 32-33.)

**B.    Relevant Medical Evidence[3]**

On September 30, 2015, Izworski underwent a split-night polysomnogram sleep study for her history of non-restorative sleep and daytime sleepiness. (*Id.* at 255.) The sleep study revealed severe sleep apnea syndrome, controlled with CPAP, and periodic limb movement disorder. (*Id.* at 256.)

On November 9, 2017, Izworski underwent an exercise stress test, which revealed oxygen saturation at 98% or higher during the period of exercise. (*Id.* at 257.) Anthony DiMarco, M.D., noted there was no evidence of oxygen desaturation with exercise. (*Id.*)

Pulmonary function tests taken the same day revealed "[m]oderate obstructive ventilatory defect with no significant improvement in flow rates following the administration of bronchodilators." (*Id.* at 258.)

On January 9, 2018, Izworski underwent a titration polysomnogram sleep study for her history of energy loss, non-restorative sleep, and daytime sleepiness. (*Id.* at 259.) The sleep study revealed sleep apnea syndrome and periodic limb movement disorder. (*Id.* at 260.) Dr. DiMarco recommended Izworski continue her CPAP at 12 cm $H_2O$ with heated humidity. (*Id.*)

On September 6, 2018, Izworski saw Jason Ignaut, LPCC, for counseling. (*Id.* at 484-85.) Izworski reported meeting with her doctor and that she would restart her medication that night. (*Id.* at 485.) Izworski also reported spending her last paycheck on lottery tickets. (*Id.*) On examination, Ignaut found Izworski had a stable, depressed, and anxious mood, cooperative behavior, and no suicidal or homicidal ideation. (*Id.* at 484-85.)

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On September 20, 2018, Izworski saw Ignaut for follow up.  (*Id.* at 486-87.)  Izworski reported an incident with her neighbor over a parking space that "escalated verbally" and that she had reduced her gambling as a result of a plan for her husband's oversight.  (*Id.* at 487.)  On examination, Ignaut found Izworski had a stable, depressed, anxious, and angry/irritable mood, cooperative behavior, and no suicidal or homicidal ideation.  (*Id.* at 486-87.)

On January 23, 2020, Izworski went to the emergency room with complaints of flu-like symptoms and shortness of breath that had been getting worse.  (*Id.* at 278.)  Izworski reported she had run out of her medications two months ago because of financial difficulties and she had not seen her primary care doctor in a while for the same reason.  (*Id.*)  Izworski told treatment providers her oxygen saturation was at 88% before receiving a DuoNeb treatment in the emergency room and she denied home inhaler use.  (*Id.*)  On examination, treatment providers found clear lung sounds, "[s]lightly decreased air exchange," no rales, rhonchi, or wheezing, no accessory muscle use, regular cardiac rate and rhythm, full range of motion, and 90% oxygen saturation.  (*Id.* at 279.)  Flu testing was negative.  (*Id.*)  Treatment providers noted Izworski underwent a second DuoNeb treatment and was breathing much better.  (*Id.* at 280.)  Izworski received prescriptions for a steroid, antibiotic, and an inhaler.  (*Id.*)  Izworski's diagnoses included dyspnea, non-compliance with medication regimen, and asthma exacerbation.  (*Id.* at 288.)

On March 4, 2020, Steven Arnold, M.D., completed a Physical Medical Source Statement.  (*Id.* at 312-15.)  Dr. Arnold listed Izworski's diagnoses as anxiety, asthma, depression, and sacroiliac disorder. (*Id.* at 312.)  Dr. Arnold assessed Izworski's prognosis as fair.  (*Id.*)  In response to the question asking for a list of Izworski's symptoms, Dr. Arnold wrote "see attached office notes."  (*Id.*)  Dr. Arnold provided the same response to a question asking for him to characterize the nature, location, frequency, precipitating factors, and severity of Izworski's pain.  (*Id.*)  Dr. Arnold likewise provided the same response asking for him to identify the clinical findings and objective signs.  (*Id.*)  Dr. Arnold opined

4

Izworski needed to use a cane for occasional standing and walking, she could stand/walk for a total of 8 hours with the use of a chair to rest against, and she could sit for a total of 8 hours.  (*Id.* at 312-13.)  Izworski needed to change positions at will.  (*Id.* at 313.)  Dr. Arnold further opined anxiety affected Izworski's physical condition and she was capable of low stress jobs.  (*Id.* at 314.)

The treatment records attached to Dr. Arnold's opinion consisted of notes from appointments on May 1, 2019, May 13, 2019, May 20, 2019, June 26, 2019, and July 12, 2019.  (*Id.* at 316-34.)  At the May 1, 2019 appointment, Izworski reported a back pain flare over the past week that had been gradually getting worse.  (*Id.* at 333.)  Izworski requested a recommendation to a spine specialist.  (*Id.*)  On examination, Dr. Arnold found Izworski in mild distress with normal station and mildly antalgic gait.  (*Id.* at 333-34.)  Dr. Arnold diagnosed Izworski with sacroiliac disorder, prescribed prednisone, and referred her to neurosurgery.  (*Id.* at 334.)  Dr. Arnold released Izworski to work later that day with no further restrictions.  (*Id.*)  At the May 13, 2019 appointment, Izworski reported worsening back pain.  (*Id.* at 330.)  Izworski had been off work since May 9 and planned to return the next day.  (*Id.*)  On examination, Dr. Arnold found normal station and mildly antalgic gait.  (*Id.*)  At the June 26, 2019 appointment for follow up of her back pain, Izworski reported her midline lumbar spine was moving more to the left over the past several months and was worse when Izworski had to lift things or was more active.  (*Id.* at 322.)  Izworski also told Dr. Arnold she had an asthma flare over the past four to five days, and while she had started prednisone and continued her inhalers, she had missed the past two days of work.  (*Id.*)  On examination, Dr. Arnold found no dyspnea, no wheezing, rales, crackles, or rhonchi, diminished air movement, normal station, and mildly antalgic gait.  (*Id.* at 323.)  Dr. Arnold diagnosed Izworski with sacroiliac disorder and asthma, and stated she could return to work on June 28, 2019 with no further restrictions.  (*Id.* at 323.)  At the July 12, 2019 appointment, Izworski reported improving back pain and numbness in her right leg if she stood for too long.  (*Id.* at 319.)  Izworski denied weakness, dizziness, migraines, tingling, involuntary

movements, balance problems, and falls.  (*Id.*)  On examination, Dr. Arnold found normal station and mildly antalgic gait.  (*Id.*)  Dr. Arnold diagnosed Izworski with sacroiliac disorder and stated she could return to work as of that day with no further restrictions.  (*Id.*)

On April 27, 2020, Izworski completed an Adult Function Report.  (*Id.* at 200-07.)  Izworski complained of labored breathing in inclement weather, a spinal injury that caused "extreme pain" when she stands for too long, numbness down her thighs, a severe mood disorder for which she cannot take her medications without insurance coverage, "horrible depression," severe sleep apnea, and anxiety.  (*Id.* at 200-01.)  "Excessive activity" aggravates her asthma/breathing, she can only get along with others when on her medication, and how long she can pay attention varies depending on her interest level and mood. (*Id.* at 201.)  She can only walk about five minutes before needing to rest.  (*Id.*)  She does not always finish what she starts.  (*Id.*)  She can follow directions well unless it involves assembling an item.  (*Id.*) She is forgetful sometimes.  (*Id.*)  She can do some housework, but she avoids yard work.  (*Id.* at 203.) She can go out alone, she drives, and she shops by phone, mail, and computer.  (*Id.*)  She can pay bills, count change, and use a checkbook/money order.  (*Id.*)  She needs reminders to take her medicine.  (*Id.* at 204.)  She can make simple meals, but her husband does most of the cooking since she cannot stand for long.  (*Id.*)  When she's upset, she has a hard time concentrating.  (*Id.*)  She can sweep hard floors but cannot vacuum, she can wash some dishes, and she can iron.  (*Id.*)  She cannot dust.  (*Id.*)  She takes her time with her chores.  (*Id.*)  Her husband carries everything.  (*Id.* at 207.)  Sometimes he has to help her in and out of the shower, and she uses a shower chair.  (*Id.*)  She has always respected authority figures and she has never been fired, although she has been written up a few times.  (*Id.* at 205.)  When she is stressed, she becomes verbal and sometimes throws things.  (*Id.*)  She "put[s] up a fight" when her routine is changed.  (*Id.*)  She sews, embroiders, and watches TV.  (*Id.* at 206.)  Sewing and embroidering reduces

her anger and anxiety, although she hurts if she sits for too long. (*Id.*) She only socializes with her daughter's family. (*Id.*) She avoids being with people. (*Id.*)

On June 21, 2020, treatment providers admitted Izworski to the hospital for acute chest pain that had been increasing over one week. (*Id.* at 430-31.) Izworski admitted she had not been taking most of her medications after losing her insurance the past fall. (*Id.* at 431.) Izworski underwent an ECG, which was normal, and troponin was negative x3. (*Id.*) On June 22, 2020, treatment providers discharged Izworski with a recommendation to take 20 mg atorvastatin a day. (*Id.*) Izworski's diagnoses included chronic obstructive pulmonary disease, insurance coverage problems, atypical chest pain, and HLD. (*Id.* at 430.)

On July 10, 2020, Izworski saw Cynthia Lord, PA, at the Lake County Free Clinic for follow up of her Type II diabetes, asthma, coronary artery disease, hypertension, hyperlipidemia, hypothyroidism, and mood disorder. (*Id.* at 514.) Izworski denied checking her blood pressure at home, although she checked her blood sugar in the morning. (*Id.*) Izworski reported nausea with Lithium and that her usual diet consisted of fast food, junk food, and sugary beverages. (*Id.*) Izworski used her inhalers a few times a day, she used her CPAP at night for her sleep apnea, and her daytime shortness of breath and cough were alleviated with her inhalers. (*Id.*) Izworski told Lord that her last emergency room visit was for anxiety and chest pain and denied any acute asthma exacerbation. (*Id.*) On examination, Lord found normal cardiac rate and rhythm, normal pulmonary effort, no respiratory distress, normal breath sounds with no stridor, wheezing, rhonchi, or rales, no chest tenderness, normal range of motion, no edema, normal coordination, normal reflexes, and normal gait. (*Id.* at 515-16.) Izworski's diagnoses included uncontrolled Type II diabetes without complication, coronary artery disease, controlled hypertension, stable moderate persistent asthma, hypothyroidism, dyslipidemia under good control, generalized anxiety disorder, and obesity. (*Id.* at 516-17.)

7

On July 30, 2020, Izworski underwent a consultative psychological evaluation with Dr. Herschel Pickholtz.  (*Id.* at 588-96.)  When asked what stopped her from working, Izworski stated, "'Back pain, breathing problems, anxiety and I get nasty sometimes.'"  (*Id.* at 589.)  Izworski reported a poor relationship with her husband but a good relationship with her children. (*Id.*)  There was some psychiatric history in her family.  (*Id.*)  Izworski reported being treated for mood disorder (not bipolar), anxiety, asthma, diabetes, and thyroid. (*Id.*)  Izworski denied any side effects of her medications.  (*Id.*)  Izworski reported she had been hospitalized for depression for a week two years ago.  (*Id.*)  Izworski told Dr. Pickholtz she had attempted suicide once in the past and had a history of depression, mania, and mood swings.  (*Id.* at 590.)  Izworski reported she currently experienced moderate depression, manic symptoms once a week for an hour, severe mood swings, and mild anxiety.  (*Id.*)  Izworski denied any disciplinary problems in school and reported a "'[g]reat'" relationship with her teachers and classmates.  (*Id.* at 591.) She got along just fine with people in her neighborhood and community until her first bad marriage.  (*Id.*) She left her job at the U.S. Post Office because she used a lot of her FMLA time and she "got a lot of flack due to her physical issues and she wasn't treated very nicely."  (*Id.*)  She left her job at Geauga Hospitals before that because her position was eliminated, but she did well at work and received good evaluations. (*Id.* at 592.)  Before that, Izworski worked for University Hospitals for a few months before being fired for forgetting to put paperwork together.  (*Id.*)  She reported doing well at work, but that she had "some interaction problems because sometimes she said things when people did things wrong."  (*Id.*)

Izworski told Dr. Pickholtz she took care of her hygiene daily, showered daily, and changed her clothing daily.  (*Id.* at 594.)  She vacuumed and swept the floors once a week, although she did not mop very often, and ironed twice a week.  (*Id.*)  She did not do laundry or grocery shop, and she did not shop for clothing often.  (*Id.*)  She cooked dinner twice a week, and used the internet, telephone, and television daily.  (*Id.*)  She spent her days getting dressed, taking medications, doing chores, visiting her daughter,

babysitting her grandchildren, washing up, sewing and embroidering for a few hours, and watching TV. (*Id.*)  She did not talk to her husband much and did not socialize with non-residential relatives, but she saw her children almost every day.  (*Id.*)  She went to religious services once every two months and did okay at church.  (*Id.*)  She had an average ability to understand and remember the content of the sermon.  (*Id.*)

On examination, Dr. Pickholtz found average persistence and pace, neat and appropriate appearance, unremarkable gait and posture, slightly sluggish and constricted motoric activity, average quality and quantity of responses, appropriate and consistent eye contact, slightly depressed vocal tone, logical, coherent, relevant, and goal-directed verbalizations, no signs of psychotic symptoms, somewhat constricted affect, slightly to somewhat depressed mood, no signs of anxiety, and average intellectual functioning.  (*Id.* at 590, 592-93.)  Dr. Pickholtz opined, "The impact of her current psychiatric complaints and conditions relative to work functioning comparable to the type of work she did in the past appears to be slightly to somewhat impaired at worst but does not appear to be severely debilitating."  (*Id.* at 595.)  Dr. Pickholtz diagnosed Izworski with unspecified mood disorder in partial remission, currently mild to moderate, with mild anxiety, and obesity.  (*Id.*)  Dr. Pickholtz opined Izworski had a "slight impairment at worst" in her ability to understand, remember, and carry out instructions, a "slight impairment at worst as long as she stays on her current medications" in her ability to maintain attention and concentration and maintain persistence and pace to perform simple and multi-step tasks, and a "slight to somewhat of an impairment at worst as long as she stays on her current medications" in her abilities to respond to supervision and coworkers in a work setting and respond to work pressures in a work setting.  (*Id.* at 595-96.)  Dr. Pickholtz noted, "She stated herself she could work if it weren't for her physical problems."  (*Id.* at 596.)

On August 13, 2020, Izworski saw Dorothy Bradford, M.D., for a physical consultative examination.  (*Id.* at 606.)  Izworski's chief complaints were sleep apnea and low back pain that radiated

down her right leg if she stood too long.  (*Id.*)  On examination, Dr. Bradford found regular cardiac rate and rhythm with no murmurs, rubs, or gallops, lungs clear to auscultation bilaterally with no wheezes, rales, or rhonchi, no spinal or costovertebral tenderness, normal muscle strength, normal range of motion of all joints, an even and regular gait with no apparent limp, shuffle, or other disturbance, full and equal motor strength in all extremities, and no neurological defects.  (*Id.* at 607.)  Dr. Bradford opined: "In my medical opinion claimant has DJD of the lumbar without radiculopathy.  Comorbid conditions are hypertension, hypothyroidism, depression and mild COPD.  She can perform light sedentary activity." (*Id.*)

A lumbar x-ray taken that same day revealed mild to moderate thoracolumbar dextroscoliosis, arthritis, possible multilevel stenosis, and L3/4 retrolisthesis.  (*Id.* at 598.)

On October 1, 2020, Izworski saw James Rodio, M.D., for medication management.  (*Id.* at 612, 615.)  Izworski reported previous treatment for major depressive disorder and gambling issues, and that she had a previous suicide attempt after "'bad anxiety.'"  (*Id.* at 612.)  Izworski told Dr. Rodio about stress stemming from family situations.  (*Id.*)  On examination, Dr. Rodio found good hygiene, "stylistically loud" non-pressured speech, circumstantial and reality-based thoughts, no hallucinations or delusions, teary effect, and present insight and judgment.  (*Id.* at 613.)  Dr. Rodio diagnosed Izworski with mild unspecified bipolar and related disorder and started her on Zoloft and Klonopin.  (*Id.* at 613-14.)

On October 12, 2020, Izworski saw Daria Cerimele, M.D., to establish care.  (*Id.* at 624.)  Izworski's PHQ-9 revealed severe depression.  (*Id.*)  Izworski reported she had been seeing another provider for the past three to four years and had been hospitalized in June with chest complaints, although no cardiopulmonary issues were noted.  (*Id.* at 625.)  Dr. Cerimele noted Izworski was due to have her A1C checked along with other lab work.  (*Id.*)  Izworski reported seeing a psychiatrist for her mood disorder but thought she wanted to switch psychological services.  (*Id.*)  Izworski reported taking

10

trazadone for sleep and Lithium for mood stability.  (*Id.*)  Izworski wanted to stop taking Klonopin as she found it too sedating.  (*Id.*)  Dr. Cerimele noted it appeared Izworski's asthma was uncontrolled.  (*Id.*)  On examination, Dr. Cerimele found normal respiratory effort, lungs clear to auscultation, normal joints, and normal mood/affect.  (*Id.* at 625-26.)  Izworski denied fatigue and problems walking.  (*Id.* at 626-27.)  Dr. Cerimele diagnosed Izworski with Type II diabetes without complication, long term insulin use, uncomplicated severe persistent asthma, hypothyroid, benign essential hypertension, generalized anxiety disorder, hyperlipidemia, coronary artery disease, and bipolar disorder.  (*Id.* at 626.)

On October 26, 2020, Izworski saw Dina Aurslanian, APRN, CNP, at the Lake County Free Clinic for follow up regarding her diabetes, asthma, and medication.  (*Id.* at 633.)  Aurslanian noted that in July 2020 Izworski's A1C level was 10.5.  (*Id.*)

On January 5, 2021, Izworski saw Dr. Cerimele for low back pain and a sleep study referral.  (*Id.* at 654.)  Izworski's PHQ-9 revealed moderately severe depression.  (*Id.*)  Izworski complained of worsening back pain over the past few months, and that she had pain walking around the store such that she needed to lean over her shopping cart at times to improve the pain.  (*Id.* at 655.)  Izworski also complained of right leg numbness when this occurred.  (*Id.*)  Izworski told Dr. Cerimele she experienced these symptoms within five minutes of walking, and they went away with rest.  (*Id.*)  Izworski complained of joint pain and muscle pain, and Izworski wondered if she had fibromyalgia.  (*Id.*)  On examination, Dr. Cerimele found normal respiratory effort, lungs clear to auscultation bilaterally, no spinal tenderness to palpation, tenderness to the paraspinal muscles as well over the SI joints bilaterally, tenderness to palpation over the bilateral trapezius muscles and symmetrically down the spine, five trigger point locations, positive straight leg raise at 60 degrees on the right, and normal gait.  (*Id.* at 655-56.)  Dr. Cerimele diagnosed Izworski with chronic lumbar radiculopathy, polyarthralgia, and obstructive sleep apnea.  (*Id.* at 656.)  Dr. Cerimele ordered an MRI of the lumbar spine and blood work.  (*Id.*)

On January 14, 2021, Izworski saw Dr. Rodio for follow up.  (*Id.* at 652.)  Izworski reported she felt "'too tired to be aggravated'" and denied any suicidal or homicidal ideation.  (*Id.*)  On examination, Dr. Rodio found good hygiene, regular gait, regular muscle tone, measured and non-pressured speech, calm affect, insight into her mood swings, and judgment to want to avoid "'fits.'"  (*Id.*)  Dr. Rodio noted, "Disability remains deliberate."  (*Id.*)

On February 8, 2021, Izworski's daughter, Jennifer Sharp, completed a Third Party Adult Function Report.  (*Id.* at 246-53.)  Sharp reported Izworski could not stand for long without pain and moving too much caused Izworski to be short of breath.  (*Id.* at 246.)  Sharp stated Izworski's back pain affected her ability to dress, bathe, and shave as bending and standing too long caused pain.  (*Id.* at 247.)  Izworski could fold laundry and iron, although it took her longer and her husband needed to help.  (*Id.* at 248.)  Sometimes Izworski's mental impairments made her want to stay in bed and Sharp and others encouraged her to do things.  (*Id.*)  Izworski could shop online and rarely shopped in stores.  (*Id.* at 249.)  Sharp reported Izworski could pay bills, count change, handle a savings account, and use a checkbook/money order.  (*Id.*)  Izworski enjoyed reading, watching TV, playing computer games, and sewing.  (*Id.* at 250.)  Everything takes longer for her to do.  (*Id.*)  Sometimes small things upset Izworski that should not.  (*Id.* at 251.)  Standing and reaching further than arm's length causes pain, she cannot walk more than 10 feet without getting out of breath, she cannot sit for long because of pain, she cannot kneel, she can only climb a few steps before having to stop, she has a hard time remembering things, and she gets frustrated when completing tasks.  (*Id.*)  Sharp reported Izworski needed a cane to walk.  (*Id.* at 252.)  Izworski's doctor prescribed the cane about a month ago.  (*Id.*)

On February 26, 2021, Nicole Schwandt, LPCC, CCLS, completed a Mental Impairment Questionnaire.  (*Id.* at 658-59.)  Schwandt listed Izworski's diagnosis as Bipolar I, severe, and listed her prognosis as guarded.  (*Id.* at 658.)  Schwandt opined Izworski was "unable to meet competitive

standards" in the following areas: carry out detailed instructions; perform activities within a schedule; manage regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; remember locations and work-like procedures; understand and remember detailed instructions; ask simple questions or request assistance; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independent of others.  (*Id.* at 658-59.)  Schwandt opined Izworski had "no useful ability to function" in the following areas: maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socials appropriate behavior and adhere to basic standards of neatness and cleanliness.  (*Id.*)  Schwandt further opined Izworski would be absent from work 50% of the time and off-task 75% percent of an eight-hour work day. (*Id.* at 659.)

## C.     State Agency Reports

### 1.     Mental Impairments

On July 25, 2020, Karla Delcour, Ph.D., found Izworski had a mild limitation in her ability to understand, remember, or apply information and moderate limitations in her abilities to interact with others, concentrate, persist, or maintain pace, and adapt or manage herself.  (*Id.* at 77.)  Dr. Delcour opined Izworski retained the ability to complete one to four step tasks without the demand for production and pace quotas and the ability to have occasional and superficial interaction with others, and changes should be infrequent.  (*Id.* at 81.)

13

On November 3, 2020, on reconsideration, Courtney Zeune, Psy.D., affirmed Dr. Delcour's findings.  (*Id.* at 86-87, 90-91.)

### 2.    Physical Impairments

On August 17, 2020, Maria Congbalay, M.D., found Izworski could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and had an unlimited ability, other than shown for lift and/or carry, to push and/or pull with her upper and lower extremities.  (*Id.* at 79-80.)  Izworski could stand and/or walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday.  (*Id.* at 79.)  Izworski could occasionally climb ramps/stairs but could never climb ladders, ropes, or scaffolds.  (*Id.*)  Izworski could frequently balance, stoop, kneel, crouch, and crawl.  (*Id.*)  Dr. Congbalay opined Izworski must avoid concentrated exposure to extreme cold, extreme heat, humidity, and fumes, odors, dusts, gases, poor ventilation, etc.  (*Id.* at 80.)  Izworski must avoid even moderate exposure to hazards such as machinery, heights, etc.  (*Id.*)

On November 4, 2020, on reconsideration, Mehr Siddiqui, M.D., affirmed Dr. Congbalay's findings.  (*Id.* at 89-90.)

## D.    Hearing Testimony

During the March 8, 2021 hearing, Izworski testified to the following:

- Her breathing problems, fibromyalgia, and back pain prevent her from working.  (*Id.* at 46.)  Most of her pain is in her lumbar spine.  (*Id.*)  She was offered a cane by her doctor, which helps if she goes into a bigger store.  (*Id.* at 47.)  The cane gives her a center of balance and she can lean on it.  (*Id.*)  She uses her cane any time she goes anywhere other than the gas station.  (*Id.*)  She has only had the cane a few months, but it has made a big difference in her walking.  (*Id.*)  She still can't stand for long and needs to sit for a while, but it provides some relief while walking.  (*Id.*)  Using her cane, she can stand for 40 minutes; without it, she can only stand for about ten minutes before she has to sit because her back and muscles hurt.  (*Id.* at 48.)  Her fibromyalgia causes dizziness, and she shakes a lot, which causes balance issues.  (*Id.*)  She has fallen down the stairs a few times.  (*Id.*)  She takes Lyrica for her fibromyalgia, which helps her sleep, but she wants to ask her doctor for something to help with the inflammation.  (*Id.*)  She has chronic fatigue as part of her fibromyalgia.  (*Id.*)  She has to go home and lay down after watching her grandchildren.  (*Id.* at 48-

14

49.)  She uses her inhaler three times a week.  (*Id.* at 52.)  She uses a CPAP machine for her sleep apnea.  (*Id.*)  Her medications make her drowsy, so on the days she has to take them she tries not to drive or go anywhere; she just lays in her bed and sleeps. (*Id.*)

- She does not vacuum, but she could vacuum if she had a lightweight one.  (*Id.* at 49.) She dusts the tables and furniture.  (*Id.*)  Her husband washes the dishes because standing at the sink for long makes her back ache.  (*Id.*)  She can drive, but she cannot sit for long, so she can only take short trips.  (*Id.* at 50.)  She has problems with bright lights and loud noises, as well as brain fog and mental confusion.  (*Id.*)

- Her depression makes her want to "close [her] eyes to the world" and sometimes she sits in bed and cries.  (*Id.*)  Sometimes she has "temper tantrums" and yells at her husband.  (*Id.*)  She gets road rage.  (*Id.* at 51.)  Sometimes she is aware of her behavior but cannot stop it, and she just goes into her room.  (*Id.*)  She is taking Lithium, but she still has tantrums and anger outbursts, so she needs to talk to her psychiatrist.  (*Id.*)

The VE testified Izworski had past work as a postal worker counter clerk, hospital receptionist, and corrections officer.  (*Id.* at 56-57.)  The ALJ then posed the following hypothetical question:

> Okay.  I would like you to assume an individual who is 60 years old, has a 12-year education plus two years of college, can read and write and perform arithmetic.  This individual has the residual functional capacity to perform light work with additional non-exertional limitations, specifically, no climbing of ladders, ropes, or scaffolds.  Frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling.  No concentrated exposure to temperature extremes, humidity, or environmental pollutants.  And no exposure to hazards, such as heights, machinery, commercial driving.  I find no severe or persistent mental limitations.  Given that, could this individual perform her past jobs?

(*Id.* at 58.)

The VE testified the hypothetical individual would be able to perform Izworski's past work as a hospital receptionist and postal counter clerk as described in the DOT but not as Izworski performed them. (*Id.*)  In response to a question from Plaintiff's counsel, the VE testified that a limitation to occasional interaction with others would preclude performance of work as a hospital receptionist and postal counter clerk.  (*Id.* at 59.)  After the ALJ stated he was going to find no severe mental limitations based on the consultative psychological examination, Izworski testified that she did not tell Dr. Pickholtz she had

problems interacting with others "because [she] was afraid." (*Id.* at 60.) The ALJ then asked the VE whether the hypothetical individual could perform Izworski's past work as a hospital receptionist or postal counter clerk if he added the limitation to "[s]uperficial interactions that do not involve arbitration, negotiation, or confrontation." (*Id.* at 61.) The VE testified the hypothetical individual could perform Izworski's past work as a hospital receptionist or postal counter clerk. (*Id.*)

## III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or

16

medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. § 404.1520(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.   20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Izworski was insured on her alleged disability onset date, August 15, 2019, and remains insured through December 31, 2024, her date last insured ("DLI").  (Tr. 15.)  Therefore, in order to be entitled to POD and DIB, Izworski must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.  The claimant has not engaged in substantial gainful activity since August 15, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: mild coronary atherosclerosis, degenerative arthritis of the lumbar spine, asthma with sleep apnea, obesity, uncomplicated diabetes mellitus, essential hypertension, and depressive disorder/bipolar disorder with anxiety (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 404.1545) to perform light

work as defined in 20 CFR 404.1567(b), except for no climbing of ladders, ropes, or scaffolds; frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; no concentrated exposure to temperature extremes, humidity, or environmental pollutants; no exposure to hazards (heights, machinery, commercial driving); and mental limitation that she have only superficial interpersonal interactions with coworkers, supervisors, and public that do not involve arbitration, negotiation or confrontation (20 CFR 404.1569a).

6.    The claimant is capable of performing past relevant work as a postal counter clerk and hospital receptionist, as these jobs are generally performed.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from August 15, 2019, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 17-33.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

18

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260

19

(E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. Medical Source Opinions

Izworski challenges the ALJ's findings that the opinions of treating physician Dr. Arnold, consultative examiner Dr. Bradford, and the state agency reviewing psychologists were unpersuasive. (Doc. No. 7 at 13-17.) With respect to Dr. Arnold's opinion, Izworski maintains that the ALJ's finding that the opinion "was not persuasive as it contained no narrative discussion of Izworski's impairments, symptoms, and/or examination findings" was "factually incorrect" as Dr. Arnold attached his treatment notes to his opinion and the treatment notes "were consistent with his findings and conclusions." (*Id.* at 14.) With respect to Dr. Bradford's opinion, Izworski argues that the limitation to a light sedentary level of exertion "was consistent with the medical evidence from the treating sources." (*Id.* at 15.) With respect to the state agency reviewing psychologists' opinions, Izworski argues the limitation to occasional and superficial interaction with others was "supported by and consistent with the evidence in the record" and the ALJ's finding to the contrary was in error. (*Id.* at 16-17.) Izworski also accuses the ALJ of "cherry-picking" the evidence of record and that he "erroneously did not build an accurate and logical bridge between the evidence documenting Izworski's disabling problems and the ALJ's decision to deny benefits." (*Id.* at 17.)

The Commissioner responds that Izworski's arguments challenging the ALJ's evaluation of the opinion evidence "'rests solely on the weight to be given opposing medical opinions, which is clearly not a basis for our setting aside the ALJ's factual findings.'" (Doc. No. 8 at 11) (citation omitted). The Commissioner argues the ALJ complied with the new regulations regarding the evaluation of medical source opinions and the decision should be affirmed. (*Id.*) The Commissioner also asserts that to the

extent Izworski intended two references to the opinions of consulting examiner Dr. Pickholtz and treating source LPCC Schwandt to be challenges to the weight assigned to these opinions, any such perfunctory argument is waived.  (*Id.* at 17.)  To the extent the Court declines to find waiver, the Commissioner argues that the ALJ explained his findings with respect to both of these opinions and therefore the decision should be affirmed.  (*Id.*)

> In reply, Izworski argues:

>> Defendant argues that Plaintiff did not discuss the opinion of Ms. Schwandt (Deft. Brief at 17). This is incorrect as Plaintiff discussed the findings and opinion of Ravenwood Health (Pl. Brief at 15-16) which was consistent with the examination findings of Dr. Pickholtz, including the fact that Plaintiff could perform 1 to 2 step tasks (a finding which would preclude her from performing her past semi-skilled or skilled work) (Tr. 595-596). The ALJ adopted those findings which supported his desired RFC and disregarded any limitation which could have resulted in a finding of disability.

(Doc. No. 9 at 3.)

Since Izworski's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R. § 404.1520c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant,

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior

---

[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

> administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

At the outset, the Court notes Izworski makes no specific arguments challenging the weight assigned to the opinions of Dr. Pickholtz or LPCC Schwandt. (Doc. No. 7.) Rather, Izworski states "the ALJ relied on the one-time examination by Dr. Pickholtz" and that "[t]he ALJ found that the opinion of the consultative examiner whose opinion he found supported his desired finding was persuasive, but a contrary opinion was not." (*Id.* at 16.) Izworski did not even mention LPCC Schwandt by name in her argument. (*Id.*) It is not for this Court to make Izworski's arguments for her. The Court finds any challenge to the opinions of Dr. Pickholtz and Schwandt waived for lack of development. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived").

After an exhaustive discussion of the record evidence, the ALJ considered the remaining challenged opinions as follows:

Consultative examiner Dorothy Bradford, M.D., opined on August 13, 2020 that the claimant can perform light sedentary activity (Exhibit B10F). This opinion is not persuasive for several reasons. First, the opinion is inadequately supported by Dr. Bradford's largely unremarkable examination, which yielded findings of obesity, but normal heart, lungs, and abdomen, full strength, and normal range of motion, straight leg raising, gait, and station (*Id.*). In addition, the opinion is inconsistent with the remaining evidence of record, which includes examination findings of obesity, occasional respiratory abnormalities, occasional tenderness, occasionally positive straight leg raising, and a mildly antalgic gait, but normal heart, otherwise normal lungs, normal joints, normal reflexes, strength, and sensation, no edema, and no noted use of an assistive device with ambulation (Exhibit B2F, B3F, B4F, B6F, B7F, B10F, B12F, B13F, B15F). This evidence contradicts a restriction to work at the sedentary exertional level, and thus Dr. Bradford's opinion is not persuasive.

Primary care provider Steven J. Arnold, M.D., opined on March 4, 2020 that the claimant can stand/walk 8 hours with use of a chair to rest against, and can sit 8 hours, but needs a job that permits shifting positions at will from sitting, standing, or walking (Exhibit B3F/2-5). Dr. Arnold opined the claimant is capable of low stress jobs and would be absent from work about one day per month (*Id.*). In support of his opinion, Dr. Arnold noted diagnoses of anxiety, asthma, depression, and sacroiliac disorder, with fair prognosis (*Id.*). This opinion is not persuasive. First, the undersigned notes the opinion is inadequately supported, as it contains no narrative discussion of the claimant's impairments, symptoms, and/or examination findings (*Id.*). In addition, the opinion is inadequately supported by Dr. Arnold's own treatment notes, which contain examination findings of obesity, occasionally diminished air movement and wheezing, and a mildly antalgic gait, but no dyspnea, rales, crackles, or rhonchi, normal blood pressure levels, and normal alertness, orientation, mood, affect, and memory (Exhibit B3F/6-24). In addition, the opinion is inconsistent with the remaining evidence of record, including the relatively mild to moderate abnormalities on diagnostic imaging and testing, and examination findings of obesity, slightly decreased air exchange, occasionally low pulse oxygen saturation, occasional tenderness, and occasionally positive straight leg raising, but normal heart, otherwise normal lungs, full strength, normal range of motion, sensation, reflexes, and station, and consistently independent ambulation (Exhibit B1F, B2F, B3F, B4F, B6F, B7F, B10F, B12F, B13F, B15F). Therefore, the opinion is not persuasive.

State disability determination services psychological consultants Karla Delcour, Ph.D., and Courtney Zeune, Psy.D., opined on July 25, 2020 and November 3, 2020 respectively that the claimant retains the ability to complete 1 to 4 step tasks without the demand for production and pace quotas, and retains the ability to have occasional and superficial interaction with others, where changes are not frequent (Exhibit B2A, B4A). These opinions are not persuasive. First, the opinions are inadequately supported, as the evidence of mood disorder/bipolar disorder, with constricted, slowed motor activity, slightly abnormal mood and affect, and loud speech, but normal alertness and orientation, good hygiene, appropriate eye

contact, no psychosis, and average range intellectual functioning on examinations noted therein, confirm the claimant is less limited (Exhibit B2A/3; B4A/2-3). In addition, the opinions are inconsistent with the remaining evidence of record, including subsequent examination findings of persistently loud speech, circumstantial thoughts, and a teary affect, but good hygiene, otherwise normal, reality based thoughts, otherwise measured, unpressured speech, intact insight and judgment, and no suicidal or homicidal ideation (Exhibit B11F, B14F).  This evidence contradicts the need for limitations to 1 to 4 step tasks without production or pace quotas, or infrequent changes, and thus the opinions are not persuasive.

(Tr. 29-30.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions.  20 C.F.R. § 404.1520c(a).  Regarding Dr. Arnold's opinion, as the ALJ found, Dr. Arnold failed to provide any narrative discussion of his examination findings and Izworski's impairments and symptoms; rather, Dr. Arnold wrote "see attached office notes."  (Tr. 312.) The ALJ then considered the attached office notes, including findings supportive of disability, and found the treatment notes failed to support Dr. Arnold's opinion.  (*Id.* at 29.)  The ALJ also identified evidence in the record inconsistent with Dr. Arnold's findings, acknowledging contrary evidence in the process. (*Id.*)  Regarding Dr. Bradford's opinion, the ALJ found the limitation to light sedentary activity unsupported by Dr. Bradford's own "largely unremarkable examination" and inconsistent with other evidence of record, acknowledging contrary evidence in the process.  (*Id.*)  Regarding the opinions of the state agency reviewing psychologists, the ALJ found their limitations to one to four step tasks without the demand for production and pace quotas, occasional and superficial interaction with others, and infrequent changes to be unsupported by the evidence of record and inconsistent with other evidence of record, acknowledging contrary evidence in the process.  (*Id.* at 30.)

It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here.  While Izworski would weigh the evidence differently, it is not for the Court to do so on appeal.

**B.      Subjective Symptom Analysis**

Izworski argues that the ALJ "failed to articulate any supportable rationale for his finding that Izworski's statements were not entirely consistent with the medical evidence . . . and her daughter's observations were not persuasive . . . . (Doc. No 7 at 22) (citations omitted).  Izworski asserts that the ALJ conducted "insufficient analysis" and only included "boilerplate language" in contravention of SSR 16-3p. (*Id.*)  Izworski also maintains that the ALJ's decision "failed to contain specific reasons for the finding on credibility, was not supported by the evidence in the case record and was not sufficiently specific to make clear to the individual and to any subsequent reviews the weight the ALJ gave to Izworski and/or the remainder of the evidence in this matter."  (*Id.*)  Izworski argues that the ALJ failed to support his findings with substantial evidence.  (*Id.*)  Izworski asserts that the ALJ's conclusion that she could perform "restricted" activities of daily living did not prove she was not as limited as alleged.  (*Id.* at 23.)  Finally, Izworski argues the ALJ "failed to acknowledge that Izworski was using a cane for standing and ambulation."  (*Id.*)

The Commissioner responds that "[t]he ALJ provided an in-depth discussion of Plaintiff's hearing testimony, the objective medical evidence, and her treatment history," and "gave more than an adequate explanation of his consideration of Plaintiff's subjective complaints"; therefore, the ALJ's subjective symptom findings must stand.  (Doc. No. 8 at 19.)  In addition, the ALJ did not rely solely on Plaintiff's activities of daily living in making his findings.  (*Id.* at 21.)  Finally, the ALJ acknowledged Izworski's statements regarding her difficulties in standing and walking and that she used a cane for walking; however, the ALJ explained why a cane was not medically necessary and why he found Izworski could perform the standing and walking requirements for light work.  (*Id.* at 22.)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir.

26

2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p,[6] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[7] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical

---

[6] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the March 8, 2021 hearing.

[7] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

sources, and any other relevant evidence on the record.  *See* 20 C.F.R. §404.1529; SSR 16-3p, 2016 WL 1119029 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should consider.[8]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Izworski's testimony and other statements regarding her symptoms and limitations, including her difficulties in standing and walking and her need to use a cane when she goes anywhere.  (Tr. 22.)  The ALJ determined Izworski's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (*Id.*)  However, the ALJ found her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record for the reasons set forth in the decision.  (*Id.*)  Specifically, the ALJ found as follows:

> The foregoing objective medical record contains evidence of mild coronary atherosclerosis, degenerative arthritis of the lumbar spine, asthma with sleep apnea, obesity, uncomplicated type two diabetes mellitus, and essential hypertension, resulting in occasional respiratory abnormalities, occasional tenderness, occasionally positive straight leg raising, and a mildly antalgic gait on examination (Exhibit B1F, B2F, B3F, B4F, B6F, B7F, B9F, B10F, B12F, B13F, B15F). This evidence indicates the claimant would have difficulty with particular activities, including lifting and carrying, and prolonged standing, walking, and sitting, thereby confirming a limitation to work at the light exertional level, where she is expected to lift and carry 20 pounds occasionally and 10 pounds frequently, and stand, walk, and sit up to 6 hours in an 8-hour workday.  The claimant has

---

[8] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

indicated greater functional limitations; however, the record is absent sufficient objective evidence to support her allegations, as examinations have revealed normal cardiovascular findings, otherwise normal respiratory findings, full strength, normal range of motion, intact sensation, normal reflexes, normal station, and an otherwise normal gait with consistently independent ambulation (*Id.*). Thus, the claimant retains sufficient residual functional capacity to perform the reduced exertional requirements of light work.

Nevertheless, given the claimant's medical history, reported symptoms, combined conditions, and the aforementioned examination findings of respiratory abnormalities, tenderness, occasionally positive straight leg raising, and a mildly antalgic gait, it is reasonable that certain postural maneuvers would pose difficulty if performed constantly (*Id.*). Therefore, the claimant can frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, and never climb ladders, ropes, or scaffolds. In addition, given this evidence, the claimant can tolerate no concentrated exposure to temperature extremes, humidity, or environmental pollutants, and no exposure to hazards (heights, machinery, commercial driving).

Although the claimant's obesity does not contribute to meeting or equaling a listing, pursuant to SSR 19-2p, the undersigned finds that the medical evidence supports a finding that the effects of the claimant's severe impairments is greater than might be expected without the obesity. Despite prior gastric surgery, the claimant remains obese, with recent examinations revealing a BMI as high as 40 (Exhibit B2F, B3F, B6F, B7F, B10F, B12F, B13F). The claimant's musculoskeletal system, particularly the weight bearing lumbar spine, is subject to stress because of her obesity, which likely causes some degeneration. In addition, the claimant's obesity likely complicates her cardiovascular history and asthma with sleep apnea, resulting in some symptom exacerbation. Thus, the claimant, as an individual with obesity, may experience greater functional limitation than an individual without. However, limiting the claimant to the reduced demands of light work, with the additional postural and environmental restrictions set forth above, adequately accommodates any symptoms of pain or breathing difficulty that are exacerbated by the claimant's weight.

As shown above, the claimant experiences symptoms associated with depressive/bipolar disorder with anxiety that would reasonably interfere with her ability to interact with others (Exhibit B5F, B8F, B10F, B11F, B14F). Although the claimant has been alert, oriented, and able to maintain sufficient concentration to participate in mental status examination, she has been tearful, with occasionally slowed, sluggish motor activity, a depressed, anxious, angry, and/or irritable mood, a constricted, anxious affect, loud speech, and loose, tangential, circumstantial thoughts (Exhibit B5F, B8F, B11F, B14F). As a result, the undersigned finds the claimant limited to only superficial interpersonal interactions with coworkers, supervisors, and public that do not involve arbitration, negotiation, or confrontation. However, the claimant does not require a limitation to unskilled work, nor is she precluded from all interaction with others, as she has been consistently alert, oriented, and cooperative, with good

hygiene, appropriate, consistent eye contact, otherwise normal speech and thoughts, intact attention, concentration, and memory, and average estimated intellectual functioning (*Id*.). Thus, additional mental limitations are not warranted.

In addition to the objective medical evidence, the undersigned has also considered other factors in evaluating the claimant's statements concerning the intensity, persistence, duration and limiting effects of her severe medically determinable impairments, including the claimant's daily activities and the claimant's history of treatment. However, these factors do not show that the claimant is more limited than determined when setting forth the above residual functional capacity.

The claimant's activities of daily living detract from her allegations of debilitating impairment, and instead support the foregoing residual functional capacity. The record contains reports of difficulty with yard work, shopping in stores, and socialization (Exhibit B4E, B12E, B8F, Hearing Testimony). However, the claimant is able to prepare simple foods, care for her daily hygiene, perform some household chores, like vacuuming, sweeping, folding laundry, and ironing, read, play cards and games, use a phone, computer, and the internet, occasionally attend religious services, engage in hobbies like sewing and embroidery, watch movies, handle money, drive, go out alone, and spend time with family members (*Id*.). These activities, while perhaps somewhat restricted, nevertheless confirm the claimant is not as limited, either physically or mentally, as she has alleged.

In assessing the claimant's allegations, the undersigned has also considered the scope of treatment. The claimant's physical conditions are treated conservatively, with medications and CPAP therapy prescribed by primary care providers (Exhibit B3F, B6F, B7F, B12F, B13F, B15F). The claimant has occasionally sought emergency room treatment for chest pain and respiratory symptoms; however, the claimant was admittedly off medications during both of these episodes (Exhibit B2F, B4F). Notably, the claimant has not required frequent emergency treatment or sustained hospitalization, despite medication noncompliance (*Id*.). Despite the claimant's cardiovascular history, she has not seen a cardiologist in several years, and she does not require treatment with any other medical specialist, such as an endocrinologist, spine specialist, respiratory specialist, or pain management provider (Exhibit B2F, B3F, B6F, B7F, B12F, B13F, B15F). In addition, despite the claimant's allegations of debilitating pain, she has not sought more extensive treatment modalities, such as physical therapy, aqua therapy, acupuncture, massage therapy, chiropractic treatment, injection therapy, or use of a TENS unit (Exhibit B1F, B2F, B3F, B4F, B6F, B7F, B10F, B12F, B13F, B15F). There are indications in the record that financial constraints and/or insurance coverage issues have inhibited the claimant's ability to access medications and treatment, and the undersigned sympathizes with the claimant's difficulties obtaining adequate medical care (*See* Exhibit B2F, B4F). However, examinations have revealed mild to moderate respiratory and/or musculoskeletal abnormalities at most, even during periods in which the claimant was without regular medical treatment and/or medications (*Id. See also* Exhibit B1F, B3F,

30

B6F, B7F, B10F, B12F, B13F, B15F). In addition, while examinations have revealed a mildly antalgic gait, there is no objective evidence of record to support the claimant's allegations of use of an assistive device with ambulation (Exhibit B1F, B2F, B3F, B4F, B6F, B7F, B10F, B12F, B13F, B15F). In sum, this evidence indicates that the claimant's physical conditions, while severe, are adequately controlled with limited, conservative medical treatment.

The behavioral health record is likewise limited and conservative. The claimant's mental impairments have been treated conservatively, with use of psychotropic medication and limited counseling services administered at Ravenwood Mental Health Center (Exhibit B5F, B11F, B14F). The claimant has remained symptomatic, thereby confirming the need for continued medication and treatment (Exhibit B5F, B8F, B11F, B14F). However, examinations have revealed generally mild to moderate psychiatric abnormalities at most, even during periods of medication noncompliance (*Id.*). The claimant has not sought more extensive treatment, such as participation in case management services, an intensive outpatient program, or a partial hospitalization program, nor has she required emergency hospitalization or inpatient psychiatric care (*Id.*). This indicates the claimant's mental impairments, while severe, are manageable with relatively conservative behavioral health treatment.

The claimant has alleged numerous complaints in support of her application for disability, and the record does support some limitations due to her symptoms and allegations. However, when considering the claimant's testimony in light of the limited, conservative treatment record and the mainly mild to moderate examination findings, the claimant's impairments are not as debilitating as she has alleged. The allegations of disability made by the claimant are therefore not entirely consistent with the evidence.

(Tr. 26-28.)

The ALJ also considered the third party function report completed by Izworski's daughter and found as follows:

The record contains a third party function report completed by Jennifer Sharp, the claimant's daughter, on February 8, 2021, noting limited activities of daily living and difficulty with standing, walking, sitting, lifting, squatting, bending, reaching, kneeling, stair climbing, memory, concentration, understanding, following instructions, completing tasks, getting along with others, and tolerating stress and changes in routine (Exhibit B12E). To the extent this constitutes an opinion regarding the claimant's functioning, the undersigned finds it unpersuasive. Although somewhat supported by Ms. Sharp's own noted observations, the opinion is inconsistent with the remaining evidence of record, including physical and mental status examinations, which yielded mild to moderate psychiatric, respiratory, and musculoskeletal abnormalities at most, and confirmed cooperative behavior, average range intellectual functioning, full strength, normal

31

range of motion, sensation, and reflexes, and a generally normal gait with consistently independent ambulation (Exhibit B2F, B3F, B4F, B6F, B7F, B10F, B12F, B13F, B15F, B5F, B8F, B11F, B14F). Thus, the opinion is not persuasive.

(*Id.* at 31-32.)

At Step Three, the ALJ found that while Izworski "testified at hearing to use of a cane with ambulation, the objective medical evidence of record fails to establish that use of an assistive device is medically necessary, as examinations have often revealed a normal gait, without any noted use of a cane or other device with ambulation (*Id.*)."  (*Id.* at 18.)

The Court finds substantial evidence supports the ALJ's assessment of Izworski's subjective complaints.  The record evidence, as noted by the ALJ, is not entirely consistent with Izworski's allegations of disabling conditions.  (*Id.* at 18-28.)  The ALJ's analysis goes far beyond boilerplate. Contrary to Izworski's allegations, the ALJ credited some of her subjective symptoms but did not accept them to the extent alleged by Izworski because of findings on examinations and her daily activities, factors to be considered under the regulations.  (*Id.*)  An ALJ can consider a claimant's activities of daily living when assessing symptoms.  *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014) ("Although the ability to do household chores is not direct evidence of an ability to do gainful work, see 20 C.F.R. § 404.1572, '[a]n ALJ may...consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.'") (internal citations omitted)).  In addition to resolving conflicts in the medical evidence, the ALJ used Izworski's activities of daily living to partially discount her testimony regarding the level of severity of her symptoms.  *See Phillips v. Comm's of Social Sec.*, No. 5:20 CV 126, 2021 WL 252542, at *10 (N.D. Ohio Jan. 26, 2021).  Furthermore, the ALJ's extensive discussion of the relevant medical evidence included several findings that undercut a finding of disability.  (Tr. 18-28.)

There is no error.

## C.    Step Four

Izworski argues the ALJ committed harmful error at Step Four of the sequential evaluation as the "ALJ failed to account for disabling pain which would interfere with [her] ability to sustain work activity" and as evidenced by the treatment records discussed in Izworski's earlier assignments of error, "the record failed to support the fact that [her] pain would allow her to stand/walk 6 hours per day as required for work at the light level of exertion." (Doc. No. 7 at 20.) Izworski maintains she "should have been limited to no more than the sedentary level of exertion" and that an RFC for light work "was in error," necessitating a remand. (*Id.*) Izworski argues the ALJ erred in failing "to include the limitations as set forth by the treating, examining, and reviewing sources" in the RFC, which would have precluded performance of Izworski's past work. (*Id.* at 21.)

The Commissioner responds that Izworski's "argument is really just a restatement of her challenge to the ALJ's evaluation of the opinion evidence and assessment of her subjective complaints." (Doc. No. 8 at 23) (footnote omitted). The Commissioner asserts that while Izworski "may disagree with the ALJ's weighing of the evidence, [] she fails to demonstrate that the ALJ's analysis was unsupported by substantial evidence." (*Id.* at 24.)

The Court agrees with the Commissioner that Izworski's Step Four challenge is a restatement of her previous arguments. For the reasons set forth above, there was no error in the ALJ's analysis of the medical opinion evidence of record or the ALJ's subjective system analysis.

### VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: November 16, 2022                            *s/ Jonathan Greenberg*
                                                   Jonathan D. Greenberg
                                                   United States Magistrate Judge